Good morning, and may it please the Court. My name is J. Ryan Lopatka from the law firm of Conn, Swick and Foddy, and we represent the lead plaintiff. This is an appeal of an order from the District Court below dismissing our complaint with prejudice. Our complaint alleges violations of the securities laws under Section 10b and Rule 10b-5 promulgated thereunder. This is a rather unique appeal. Typically, plaintiffs in this position are arguing scienter that the District Court erred in ruling that the plaintiff didn't plead scienter, but that's not the case here. Plaintiffs actually pled scienter with sufficient particularity, and what's even more rare about it is that we did it based on solely motive and opportunity allegations, insider stock sales. We also adequate There were substantial numbers of those in this case. Correct. Collectively, between the two individual defendants, $36 million. There was $26 million, I believe, accounted for between the first and second phases the first and second phase and the second and third phase. Were the other $10 million sort of spread out? Correct. During the class period? Correct. Actually, the stock was at its highest point when the majority of the stock sales took place, actually. Uh-huh. And we also pleaded, adequately pleaded, at least one category of false statements related to enrollment violations. So thus, the District Court entered judgment against plaintiffs solely on the basis that we failed to adequately plead loss causation, which he recognized is a Rule 8 pleading standard. Also, the — there was a problem as far as falsity is concerned with the September and the March statements. Correct. And I'd like to address those. He basically said that they were, as I understood it, opinions or puffery of one sort or another and not statements of fact. Correct. That could not be — okay. And — Why don't you go to the — start with the September statement, maybe. Okay. The first one, and the one that we, I think, addressed the most in our briefing, is the statement that you can look at the last 30 years, all the major studies, pancreatic cancer, U.S.-based studies. I want to make that distinction. Survival rates come between 15 to 19, 20 months. That's it. In Omnicare, the Supreme Court said that a fact is a thing done in existing. This statement here is a statement of fact. It's not expressing any sentiment, any belief. It's not couched in language of belief. But Judge — He's saying that major is sort of a matter of opinion. The other side is saying that major is a matter of opinion. What do you — what do you think about that? I think that's a problem. And the reason why I think that's a problem is that major is simply an adjective in this statement. You could replace it with large or any other adjective, and it automatically transforms it, apparently, into a statement of opinion. And I think that's a dangerous precedent to set, that adjectives turn statements of fact into statements of — Well, we wouldn't have to say all adjectives, but isn't — but isn't this one pretty important in this particular statement? I mean, you have to make judgments and evaluations to determine what pool out of all the studies on various matters in the world constitute the major ones. And not all people would agree as to what constitutes a major study in a scientific field. And I appreciate that. I think the issue that I have with it is that the bookends of the statement, which are all the major studies, and that's it. He wanted to make it sound definitive and absolute. And one issue is that I think when you're saying a statement about all the major studies, there are certain studies that you would have to characterize as major. I think if you were saying all the major cities in America, you couldn't exclude New York. There are certain things you can't exclude. And I think that it presents a statement of fact that Judge Pauly shouldn't have been deciding at this point. I think this is something — Well, if you would exclude some and someone else would include some, isn't that a matter of opinion? I would say it's — I wouldn't say necessarily it's a matter of opinion. I think it's a matter of fact. And I think if you could have experts on both sides arguing for and against, then that's why I think it's an issue that should go to a jury rather than Judge Pauly just — lack of a better phrase. What if you used the word substantial rather than major? That — maybe that's a little more definite. I don't know. But it amounts to, in my mind anyway, at least possibly the same thing. I think what's — the problem is here that there's — when I read this statement, I get your point that what he's doing is creating the impression on the part of the recipients that the 15 to 19 to 20 months is what everybody's saying. That's what he's saying, I think it's what — not everybody, but everybody. All the major studies say it. And the way — so it creates some sort of tension in my mind between what is a statement of fact and what is a statement of opinion. And I'm not — once you're in the statement of fact area, then the plaintiff's job is a lot easier than when it's a statement of opinion. And I'm well aware of that, Your Honor. Yet it's very — yet the — the distinction is, at least in my mind, is not as clear as the Court seemed to be trying to play it out, and Omnicare tried to play it out. I agree. If I may, I think there's an important point that I'd like to make if we do assume that it is a statement of opinion. The other error that I think Judge Pauly made was he failed to credit our allegations related to insider trading that seemed to belie their positive statements throughout the class period. In his first order, Judge Pauly wrote that nothing in the complaint suggests even on information and belief that defendants' publicly expressed opinions were different than or contradicted by their true opinions. And there are some statements that I would characterize as opinions that we allege in our complaint. But their positive opinion statements show that they're bullish on the prospects for this drug's approval. They were dumping the stock. But they're dumping the stock. That's showing that they're bearish. I think this absolutely does cut against their opinions, and these allegations should have been credited, but he didn't credit them at all. And under the law, I don't see a reason why that was. Just very quickly, I'm going to turn to loss causation. I just have a few seconds left. I think the big issue here is that Judge Pauly wanted the corrective disclosures to specifically mention enrollment violations. But under the law of the circuit, there's no requirement for that. I see that I'm out of time. May I ask a question? So the enrollment violations you're talking about are the Phase 2 or 3 at this point? This is enrollment into Phase 3. Phase 3. And the corrective statement was what again? The corrective statement was the — I mean, there are two corrective statements that relate to enrollment. But the final corrective statement is the major corrective statement, which is the failure of the whole thing. Failure of the whole thing. Correct. And our position is enrollment is a necessary component part of this trial. And so when the trial fails, that reveals something about — It doesn't necessarily reveal about enrollment, though. No. It doesn't necessarily reveal that. But I think actually analyst statements afterwards suggested that something may have been wrong with this trial given the survival rates that were reported and called for an investigation of the company. Yeah. Is loss causation, that's a Rule 8 pleading standard. Correct. Well, at least that's what the courts of this circuit have been deciding it under. Right. But this circuit itself hasn't said that yet. Not yet, no. Within the courts, yeah. District courts are. Thank you. Good morning, Your Honors. May it please the Court. Sarah Lytale on behalf of defendants Newlink Genetics, Charles Link, Drs. Charles Link and Nicholas Bohanian. This case follows a familiar paradigm. Just days after learning that a clinical trial had not met its endpoints, pharmaceutical investors filed suit and attempted to convert a scientific failure into federal securities fraud. Yeah, but this is a little different. This case is a little different than the usual market going up and down based upon various disclosures because the plaintiffs here, I mean the defendants here, were selling off their holdings, their considerable holdings, after these various press conferences. So one could look at this in a very abstract way and say this was like market manipulation. You know, they knew how to get the price up so that they could sell. And then the next time a study came in and there was bad news and the price dropped, they were back in there trying to figure out how to get their price up so they could sell. That's one way of looking at this case. Wouldn't you agree? I would agree that that is one way of looking at it, Your Honor. I think that it's very important to take into account the structure of this trial here, and I think that the facts here simply refute that take on it because, in fact, the defendants were blinded to the study data throughout the entirety of the trial. This was a trial of a vaccine for pancreatic cancer, which is one of the worst cancers that there is. Enrollment in the trial began in 2010 and the trial concluded in 2016, and it is undisputed that throughout that entire time the defendants had no idea what survival data was coming out. There was an independent data safety monitoring committee that released very, very specific data at very, very specific intervals. Well, they had the Phase II survival data, didn't they, 24 months, 24.1 months? Yes, that's correct, Your Honor. So they were measuring that, and in order for this to be ultimately successful, I think somewhere I read in the papers that it had to beat the survival rate by 20 percent. So, Your Honor, that — I'm glad you pointed that out. That's actually a new argument on appeal. It's not actually alleged in the complaint. The Phase II trial was structured so that there were two arms, one — but there was no control group. There was an arm receiving a high dose of the vaccine and there was an arm receiving a low dose. In Phase III, Phase III trials have entirely different — can have very different structures and sizes. This one had a different size by an order of magnitude, by an order of 10, and it had a very different structure. It had a control group, which Phase II did not have. That's absolutely correct, Your Honor. You don't know why Phase II didn't have a control group? Any inclination on that? Your Honor — Sorry. Oh, I apologize. Phase II is designed to test preliminary efficacy as well as safety. So the Federal regulations that the FDA has promulgated provide that Phase II — the different phases have different purposes. So, obviously, we believe that the dismissal here should be affirmed. And I think I will start by addressing loss causation unless the panel has another preference. Well, can I just ask, going back to my colleague's question, the selling of the stock, why isn't that some evidence that opinions about the opinion, if we treat it as an opinion for the moment, about major studies might not have been honestly held? Your Honor, there is no case that we are aware of or that the plaintiffs have cited where the bare fact of an executive stock sale during the course of the class period has been used to infer falsity, particularly, but not only, when, you know, the executive is giving an opinion, a scientific opinion. If you're assuming that the first statement, the September statement, is an opinion when he's saying, you know, he's sort of couching it. I want — the survival rates come between 15, 19, and 20 months. That's it. Now, isn't — when he says, that's it, that sounds like fact to me, the words, that's it. You know, you can couch — you can use major in the preliminary part, but then you conclude by saying, I want to make that distinction. Survival rates come between 15 to 19 to 20 months. That's it. That sounds — sounds like a statement of fact to me. Certainly, Your Honor. So there are two — so two aspects of that that I would address. The first is the word major, which I think is absolutely critical and I'll come back to since that's been addressed. The words, that's it, I — Well, how about — and also, while you're addressing major, why don't you address the word all? All the major studies indicate, want to make that distinction, and then he says, that's it. So I believe he says all the major studies, U.S.-based studies, I want to make that distinction. So what the district court did was it looked at the context of Dr. Vahanian's remark here, which is — I should note that it comes at the end of six single-spaced pages in the transcript of remarks at a conference where he's been speaking about what Newlink's doing and what, you know, their scientific views and his trial. And it's only at this tiny piece that the plaintiffs have plucked out. The specific context that this statement comes in is where Dr. Vahanian is making a point and is illustrating that there is a much narrower window of difference in predicting survival for patients with pancreatic cancer as opposed to patients with other types of pancreatic cancer. And the type of cancer that he's using, and you can see this just from just a few lines before in the statement the plaintiffs have plucked out, the cancer that he's using as a comparator is melanoma. So he says when you look at melanoma, the survival rates have been much broader. The window of flexibility for predicting survival rates is much broader. So it could be — you could — you see melanoma, survival rates have come between 10 and 40 months. And then he makes the point for pancreatic cancer, that window has been much narrower, and it has not changed in the last three decades. And that's — those are undisputed facts. That's a scientific opinion that the plaintiffs have not attempted to dispute. And so what the district court did here was take a look at the context in which this statement was made. And instead of taking the two words, that's it, you know, and simply taking that in isolation, he looked at what Dr. Vahanian was actually saying. Moving back to the use of the word major, I would say that it is absolutely critical here. And the best example we can use, I think, is the framing that the Supreme Court gave us in Omnicare. A statement of opinion is a belief or a view that the mind forms of things. So Dr. Vahanian's mind needed to form a belief about what was major because that's simply not an objectively verifiable fact. You can't find a journal, for example, that's called the Journal of Major Studies. You cannot find on the title page of any of the articles that the plaintiffs have relied on in the special appendix an indication that those are considered major studies. So absolutely we believe that that was critical and that was an opinion. Well, you know a lot more about this case than I do for sure. And one question I had was that apparently he mentioned the Hidalgo paper in certain respects. And your adversary points out that he left out other respects. So he said that for the Hidalgo papers, the two people in Phase 2, Stage 2, sorry, Stage 2A and 2B patients, the survival rates were 15.4 and 12.7. But he left out that the Stage 1A and Stage 1B patients were 24 months and 20.6 months. And so he was giving an incomplete picture there. He was picking and cherry-picking the parts that he liked. So to that, Your Honor, I would respond that he was not cherry-picking the parts that he liked. As is clear from the reference in the statements, he was referencing Stage 2A and Stage 2B data from Hidalgo because the Phase 2 trial that Newlink had conducted had overwhelmingly consisted of patients in those phases. So it was, I believe, 96 percent in Stage 2 of the 70-some-odd patients in Newlink's Phase 2 trial. And he specifically notes that when he calls out the data point from Hidalgo that he's viewing as relevant there. And what about the PCOSI list of studies, which shows survival rates of resected pancreatic cancer of 43, 25, 25, and then 21, 20, before you get below 20 to one study, which said 16? Certainly, Your Honor. So the PCOSI table is from an article from 2010. Dr. Vahanian's statement that's being challenged here is from 2013. That's one point that I would make about it. The other is that the title of the ---- What, was he including any of these PCOSI studies when he spoke about the major  Your Honor, Dr. Vahanian's statement did not specify in the part that the plaintiffs are challenging, did not name specific studies that he had in mind when he said all the major studies. But what the district court did here was to look at the other studies that New Link had talked about and that Dr. Vahanian had talked about in the context of that statement and found that they reasonably supported Dr. Vahanian's statement. The largest pancreatic cancer study that was conducted prior to New Link's Phase 3 study was called RTOG 9704. And that one was discussed ad nauseum by Dr. Vahanian. Excuse me? Was that one at Johns Hopkins? No. RTOG 9704 was a multi-institution study. And in fact, I'm glad that Your Honor pointed that out because the fact of whether a study is multi-institution or limited to one institution and whether that institution is representative of, you know, institutions around the country may well drive a scientist's opinion of how informative that study is as to the entire field. Is it in the record as to what percentages of their stock was sold during the class period? There is some dispute about this in the record, Your Honor. So if you take into account exercisable options, the percentage is drastically different than the percentages if you do not take into account exercisable options. And so the plaintiffs pleaded it based on excluding exercisable options. We presented it based on including exercisable options. And the district court believed that that was an issue that was better suited for summary judgment. I would like to address my colleague's note that this case is unique because Sienter was adequately pled. I think it's very, very critical to note that Judge Pauly actually only found a strong inference of Sienter with respect to a single statement, and that was the statement that Newlink had completed patient enrollment in 2013. And that's the statement that was connected to the allegations and the complaint about the confidential witness. That's exactly correct, Your Honor. And so this is on Joint Appendix 694 to 95, where that cabining of his holding is reflected. And so we would not – Judge Pauly did not hold, and it wouldn't make any sense that there was some finding of, you know, abstract fraudulent intent untethered to any sort of – any specific statement. I see my time is up. Thank you. Just a couple of quick points. First, a colleague here said that the 20 percent difference, you know, the study needed to show a 20 percent improvement at the final approval stage. That's pled several times in the complaint at Joint Appendix 715. That's paragraph 42. There are several other points where that's mentioned. The math between 24.1 months and doing 20 percent, that's a calculation that – all those facts are pled in the complaint. I'm just doing a calculation for the argument. Also, talking about the RTOG study, Counselor mentioned that this is a multi-institutional study, so this might have certain added effect and lead Dr. Vahinian to focus on this versus other studies. But I don't know of another multi-institutional study that actually fit in that survival rate window. And I looked at quite a few. The John Hopkins study is a retrospective analysis, but apparently they said that that supports their survival rate assumptions as well. Lastly, I'd just like to mention for loss causation, recently we submitted a 28-J letter, and although it's not binding precedent, another district of New York court found on very similar facts that the simple failure of the trial did actually correct statements regarding enrollment. Let me ask you a question on loss causation. Is there a correlation document in the – or a chart somewhere in the record that matches the stock sales to the dates of the various alleged misleading statements and opinions that you rely on? There's not one that tracks it that well. We single out certain large stock sales and time those out, but there's not a chart that actually lays out every single sale. There were actually dozens of transactions. Yeah. So where is that? Is that you have a chart that does that for the large ones, or is it just what you've mentioned in your – that's what's in the complaint? It's just what's in the complaint. I'll give you a quick cite. It shouldn't take me long to find this. I apologize. There are – this would be starting on page – joint appendix page 768 and going to 774. Okay. Thank you. Thank you both. Nicely argued.